## Allen v. Jenkins, et al.

(Decided February 12, 1914.)

Appeal from Warren Circuit Court.

1.  Contracts—Performance—Time When Not Essence of Contract.— Generally speaking, time will not be regarded as the essence of a contract respecting the sale and purchase of land, and the vendor may compel the vendee to take the property although he may not be able to tender him a good deed until within a reasonable time after the deed should have been made.

2.  Process—Service on Person of Unsound Mind.—Under section 53 of the code, a summons must be served on the person of unsound mind, and, in the order named, on one of the other persons mentioned in the section, and the record should show that the person on whom it was served was the proper person in the order named upon whom to execute the process.

3.  Process—Acknowledgment of Service—Sufficiency of.—Under section 47 of the code, a service may be acknowledged by the person to be summoned by an indorsement on the summons, signed and dated by him and attested by a witness, and if the

acknowledgment is not attested in the manner provided, the mere acknowledgment of the defendant of service will not be sufficient to support a judgment by default, but, although the acknowledgement of service might not be sufficient to take a judgment by default, if the person thus summoned enters his appearance in the action, this will supply the deficiency in the service.

4. Process—Purpose of Service of.—The purpose of the summons is to notify the defendant of the institution and pendency of the suit, and to make sure that he has received this notice, the law has provided certain safeguards to prevent mistake or fraud; but when the person who is insufficiently summoned enters his appearance, the purpose of giving notice by summons is fulfilled.

5. Bonds—Bond Under Section 493 to Person Under Disability—Necessity and sufficiency of—Failure of Principal to Sign.—The execution of the bond required by section 493 of the code is indispensable, but it is not essential to the validity of the bond that it should be signed by the principal. The signatures of two sureties accepted by the court will make it a good statutory bond.

SIMS & RODES for appellant.

JOHN B. GRIDER for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In July, 1911, John S. Hubert, and Asher Jenkins contracted in writing to sell to I. C. Allen their farm of 82 acres for $85 per acre. Under the terms of the sale as specified in the agreement, $500 was paid in cash and $500 was "to be paid about January 1, 1912, at which time first parties agree to make deed" and the balance of the price was to be paid in equal, annual installments. It was further stipulated that the Jenkins would convey a good title to the land and give possession on January 1, 1912.

A short time after this agreement was made the Jenkins, upon consulting with an attorney, discovered that they did not own, as they believed they did, the fee simple title in all the property they had sold to Allen. They learned that one W. L. Beck, a lunatic at that time confined in the Hopkinsville insane asylum, owned a one-fourth undivided interest in remainder in the land subject to the life estate of J. S. Jenkins. When this condition of the title was ascertained, the Jenkins, with a view of perfecting their title so that they might be able to comply with their contract, had a committee appointed for Beck,

and this committee at once brought a suit in the Warren Circuit Court against the lunatic under subsection 4 of section 489 of the Civil Code for the sale of his estate for his maintenance, and the payment of the debt due to the Hopkinsville asylum. A summons issued in this suit was regularly executed upon the lunatic by delivering to him a copy, and another copy of the summons was executed by delivering it to E. P. Sights, the superintendent of the asylum in which Beck was confined. It appears that service of this summons was accepted by the superintendent in the following words: "I, as superintendent of the Western Asylum for Kentucky, accept service of the within summons, November 11, 1911, H. P. Sights."

In this suit the asylum filed a claim against the estate of Beck for $295 due the asylum for his maintenance, and this claim was supported by the affidavit of H. P. Sights, the superintendent, and also by the affidavit of an officer of the asylum.

At the succeeding January term of the Warren Circuit Court a judgment was entered which, after reciting that the lunatic had no property of any kind except his interest in this land, and that he was indebted to the asylum for maintenance, directed a sale of his interest. On January 23rd the commissioner filed his report of sale, which recited, among other things, that Asher Jenkins became the purchaser, and thereafter, on January 27th, a deed was made by order of the court conveying to the purchaser the interest bought by him.

Thus the matter stood until September, 1912, when Allen brought suit against the Jenkins to recover the five hundred dollars that he paid them when the contract concerning the land was entered into. The ground of recovery was in substance that the Jenkins had not and could not convey the land by a good title, and this being so, Allen was entitled to the return of the money that he had paid.

For answer to this suit the Jenkins averred that at all times after January 27th they were able, ready and willing to convey a good title to Allen, but that he refused to accept the title or to comply with his contract, and, therefore, they were entitled to retain the money that they had been paid.

Upon hearing the case the circuit court dismissed the petition of Allen and he appeals.

One of the grounds relied on for a reversal of the judgment is that the Jenkins were not able to perform their part of the contract by conveying the land by a good title within the time mentioned in the contract, and for this reason Allen was under no obligation to take the title and was entitled to have a return of the $500 he had paid; and it is further said that even if this view is not sound, the Jenkins did not at any time tender to him a good title to the land.

It appears from the evidence that Allen, who lived in Barren County, went to Bowling Green, in Warren County, on January first, 1912, with the intention, as he states, of complying with his part of the contract. He testifies that while in Bowling Green he met one of the Jenkins and was informed that they could not make a good title on that day but would be able to tender him a good title by February first, or if not, they would then return to him the five hundred dollars that he paid. He further says that after getting this information he returned to his home, and went again to Bowling Green on January 25th, when he was advised by attorneys that the Jenkins could not make him a good title, and thereafter he treated the contract as rescinded, although he was at all times ready, able and willing, previous to January 25th to comply with the contract.

On the other hand, the evidence in behalf of the Jenkins is, in substance, that at no time after January first was Allen willing to accept a good title or comply with his contract, and by various acts and conduct on his part not necessary here to recite he manifested his intention not to accept a good title after January first or to comply with his contract after that date. Their evidence further shows that after Allen declined to accept the title when they were prepared to make a good one in the latter part of January, they did not thereafter think it necessary to tender him a deed in conformity with the contract and did not do so.

It will be observed that the contract stipulated that the second payment of five hundred dollars was to be paid "about" January first, 1912, at which time a deed was to be made, and we do not think time was the essence of this contract in the sense that it was indispensable to its binding effect on Allen that the Jenkins should have been able to tender him a good deed on January first. The payment of the second five hundred dollars was to be

made "about" January first, but not until this payment was made was the deed to be made, and it does not appear that Allen at any time offered to pay this five hundred dollars or demanded that a deed should be made to him.

The weight of the evidence conduces to show that Allen before January first became dissatisfied with his contract and that he did not intend or desire to comply with it if there was any means of escape, and when he announced on January 25 that he would not accept a deed or perform his contract it was not necessary that one should have been tendered to him on January 27th when the Jenkins were in a position to make him a good title if the proceedings in the suit of the committee against Beck and the deed made therein invested them with a good title to Beck's interest. Under this contract the Jenkins had a reasonable time after January first to tender a good deed and we think that if they were prepared to do this on January 27th, a deed tendered on this date would be a sufficient compliance with the contract.

In Posey v. Kimsey, 146 Ky., 205, we said, in an analagous case concerning the specific performance of a contract, that "the rule is a very well settled, that when time is not of the essence of the contract, the vendor will be given a reasonable time in which to perfect his title. Thus, in Logan v. Bull, 78 Ky., 607, the court said: 'The equitable rule as now settled by nearly all the authorities on the subject is, that when the contract is required to be performed, if the party is able to convey, and tenders his deed, the contract will be enforced, although his title was defective at the date of the contract; and if not able to convey at the time of filing a bill for rescission, if time is not of the essence of the contract, the chancellor will permit the vendor, if he can do so within a reasonable time, to supply the defects in his title, so as to comply with his contract.' "

In the case we have the Jenkins had a good title to all of the land except an undivided one-fourth interest in remainder at the time the contract was made, and they believed in good faith that they had the title to the whole of the land. Upon discovering the defect in the title they at once took steps to perfect it and were in a position to tender to Allen, assuming that the proceedings in the suit of the committee were regular, a good deed to the whole of the land within thirty days after January first,

and the tender of a good deed on that date would, we think, have been within a reasonable time.

The correctness of this view is further supported by the terms of the contract which stipulated that the deed was to be made "about" January first and then not until the five hundred dollars was paid, which payment or tender of payment was a condition precedent to the right to demand or receive the deed, and, as we have seen, no payment or tender of payment was made.

The remaining question in the case relates to the regularity of the proceedings in the suit of the committee under which the interest of the lunatic was sold and purchased by the Jenkins. If the proceedings in this case were not regular and did not divest the lunatic of his title to this interest, of course the Jenkins were not in a position at any time before the institution of this suit to tender to Allen a good deed, and if this was so, he should have succeeded in this action to compel a return of the five hundred dollars.

In an action under subsection 4 of section 489 of the Code for the sale of the estate of a person of unsound mind for his maintenance, it is essential that the action should be brought by the committee of the person of unsound mind and that the summons in the action should be served in the manner provided in section 53 of the Code. This section reads:

"If the defendant be of unsound mind the summons must be served on him and on one of the following named persons, if residing in the county, viz.: On his committee; or, if he have no committee, on his father; or, if he have no father, on his guardian; or, if he have no guardian, on his wife; or, if he have no wife, on the person having charge of him; or, if the defendant be a married woman of unsound mind, and her husband be plaintiff in the action, the summons must be served on her and her committee; or, if her husband be not plaintiff in the action, upon her and her committee, if she have one; or if she have no committee, upon her and her husband. * * * Service of a summons, by delivering a copy of it to the physician having charge of a person of unsound mind, shall have the same effect as a service on the person of unsound mind, if such physician gives a certificate, attested by the officer delivering him the copy, that a personal service would, in his opinion, be injurious to such person of unsound mind."

There is no criticism of the form of the action by the committee or objection that the proper persons were not made parties to it or that the lunatic was not served with process, but it is said, first, that the service of process on the superintendent of the asylum in which the lunatic was confined was unauthorized, and, second, if authorized, the return on this process was not sufficient to bring the lunatic before the court.

It will be observed that under section 53 the summons must be served on his committee, "Or if he have no committee, on his father; or, if he have no father, on his guardian; or, if he have no guardian, on his wife; or, if he have no wife, on the person having charge of him." So that to make service of the summons on the person having charge of the lunatic sufficient it should appear in the record in some way that he had no committee, father, guardian or wife, or that one or all of these persons were plaintiffs in the suit, or interested adversely to the lunatic and, therefore, not proper persons to be served with process.

Here the suit was brought by the committee, and this being so, the summons should have been executed on some of the other persons authorized by the code, and we find it averred in the petition that the father and mother of the lunatic are dead and that he has no brothers or sisters or children or guardian or wife. There being no attempt to controvert this averment, it is manifest that it was proper to serve the summons upon the superintendent of the asylum in which the lunatic was confined, as he was the person in charge of him.

The next question then is, was this summons executed upon the superintendent of the asylum in conformity with the Code provisions? Under section 47 of the Civil Code provision is made for the service of a summons by an officer or other authorized person, and in section 50 it is provided that "service may be acknowledged by the person to be summoned by an indorsement upon the summons, signed and dated by him and attested by a witness. The affidavit of the witness shall be proof of the service."

It will be noticed that service of the summons in this case was acknowledged by Sights, superintendent of the asylum, but his acknowledgment was not attested by a witness or accompanied by the affidavit of a witness, as provided in section 50, and it is urged that this defect in the acknowledgment was fatal to its sufficiency in view

of the conceded fact that it was essential to bring the lunatic before the court that service of process should be had upon the superintendent. It is apparent that the requirement of section 50, that the acceptance of service by the defendant should be shown by the affidavit of a witness, was to enable the court to know with certainty that the defendant had been regularly summoned, and to protect the defendant from any wrong or fraud that might be attempted to be practiced upon him by a false or forged acknowledgment of service. The whole purpose of the summons is to notify the defendant of the institution and pendency of the suit, and to make sure that he has received this notice, the law has provided certain safeguards to prevent mistakes or fraud and to attest the genuineness of the notice.

This being the purpose to be accomplished by the service of a summons it would seem to follow that when it is shown that the defendant has been duly summoned by the return of an officer or some one authorized to execute the process, or by the acknowledgment of service in the manner provided in section 50, or by the act of the defendant in entering his appearance in the action in such a manner as that the record will show his knowledge of the suit, the purpose of the law to give notice had been fulfilled and the suit may proceed with the same effect, whichever of these forms of notice is clearly shown by the record. Bell v. Smith, 24 Ky. Law Rep., 1328.

We do not think that an acknowledgment of service in the manner this summons was acknowledged, or an acknowledgment not attested as provided in section 50, would be sufficient, nothing else appearing in the record, to sustain a judgment by default against a defendant, because the court could not know from the acknowledgment that it was genuine, and it is the genuineness of the acknowledgment when there is no appearance that must be established by the attestation and verification of a witness. This we understand to be the ruling in the cases of Peers v. Carter, 4 Litt., 268; Jackson v. Speed, 3 J. J. Mar., 56; South v. Carr, 7 T. B. Mon., 419; Kendrick v. Kendrick, 4 J. J. Mar., 241; Hackwith v. Damron, 1 T. B. Mon., 235.

Having this view of the matter, we would hold that a judgment on this attempted service would be certainly erroneous if not void except for the fact appearing in

the record that the superintendent of the asylum made himself a party to the suit by coming into the case and filing his verified claim against the estate of the lunatic. This appearance of the superintendent furnished sufficient evidence of the genuineness of the acknowledgment and dispensed with the proof of it required by section 50. Both the return on the summons and the fact showing the appearance of the superintendent are a part of the record and should be considered together in determining the sufficiency of the service and the genuineness of the acknowledgment.

Another objection to the validity of the judgment is urged on the ground that the bond required by section 493 of the Civil Code was not executed. This section provides that "* * * the committee of each person of unsound mind * * * must before the sale is ordered, execute a bond to the * * * person of unsound mind, with at least two sureties, worth not less than double the value of the estate to be sold, in substance as follows: 'We, ........................, and ................................. sureties, bind ourselves to ..................... that the said .................. as committee will faithfully discharge all of his duties as such * * *.' " And further provides that "If the bond be not given, any order of sale, and any sale or conveyance made under such order, shall be absolutely void and of no effect."

We have written in many cases that the provisions of this section are mandatory and that unless the bond is executed the sale will be void: Hughes v. Saffell, 134 Ky., 175; Cornell v. Cornell, 131 Ky., 650; Watkins v. Northern Coal & Coke Co., 132 Ky., 700, and so it only remains to be seen if the bond required by this section was executed, for if not the judgment ordering the sale of the lunatic's interest was void.

The record shows that before the judgment ordering the sale of the land was entered that the following bond was executed and examined and approved by the court: "We, L. P. Maxey, Committee, principal, and Hubert Jenkins and Asher C. Jenkins, sureties, bind ourselves to the Commonwealth of Kentucky in the penal sum of $1,000, that the said L. P. Maxey, as committee for Wm. L. Beck will faithfully discharge all the duties as such, and will comply with the judgments and orders of the court in the action, and will account for, pay and deliver to the said Wm. L. Beck all money or property

due, or belonging to him, when required. (Signed) Asher C. Jenkins, Hubert Jenkins.''

It might here be noticed that the mention of a specific sum in the bond is in conformity with an act of the Legislature approved March 23, 1910, that may be found in the Acts of 1910, page 263. The objection urged to the validity of this bond is that it was not signed by the committee. It will be noticed that section 493 required that the committee shall ''execute a bond * * * with at least two sureties, worth not less than double the value of the estate to be sold,'' thus making it plain, we think, that the purpose of this bond was to have the estate of the person whose land was sold protected by solvent sureties. It is the sufficiency of the sureties to make the bond and not the solvency of the principal that is looked to. The principal may be insolvent and yet if the sureties are good the bond may be accepted. The reason for requiring solvent and sufficient sureties is that the principal is already bound as fully as he could be by joining in the execution of this bond by the former bond that he executed when he qualified, as in this case, as committee. If the principal had joined in the execution of this bond, it would not have added anything to the security of the lunatic's estate, as the estate, so far as the principal was concerned, was protected as well as it could be by the bond he executed when he qualified as committee. Nor did the failure of the committee to sign this bond deprive it of its character as a statutory bond or convert it into a common law bond. It complied, as we think, with all the substantial requirements of section 493, and the sureties were as fully bound as if the principal had signed it. The failure of the principal to sign the bond did not at all prejudice the rights of the sureties, because if they sustained any loss by reason of his misconduct as committee, they would have the undoubted right to look to him for indemnity to the same extent as if he had signed the bond. It is true the form of the bond given in the Code contemplates that it shall be signed by the principal, but this form is not of the substance of the bond. It is the signatures and sufficiency of the sureties that make the bond valid, and when they have signed it their liability is fixed by the terms of the obligation: Harrison v. Bank of Kentucky, 3 J. J. Mar., 375; Jones v. Skiles, 1 A. K. Mar., 541; Trustee of School v. Skeik,

119 Ill., 579, 59 Am. Rep., 830; City of Deering v. Moore, 86 Maine, 181, 41 Am. St. Rep., 534.

Upon the whole case we think the judgment appealed from was correct, and it is affirmed.